IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2015 Session

## STATE OF TENNESSEE v. WINDIE L. PERRY

**Appeal from the Circuit Court for Montgomery County**
**No. 41100485     John H. Gasaway, III, Judge**

---

**No. M2014-00029-CCA-R3-CD - Filed June 5, 2015**

---

In January 2012, a jury convicted Windie L. Perry ("the Defendant") of two counts of especially aggravated kidnapping, two counts of aggravated child abuse, facilitation of rape of a child, aggravated assault, two counts of false imprisonment, and six counts of reckless endangerment. For these offenses, the trial court imposed an effective 20-year sentence. On appeal, the Defendant challenges the sufficiency of the evidence as it relates to her convictions for especially aggravated kidnapping, aggravated child abuse, facilitation of rape of a child, and aggravated assault. Following review of the record and relevant authority, we reverse the Defendant's conviction for aggravated assault, because aggravated assault is not a lesser-included offense of aggravated child abuse as charged in the indictment under Tennessee Code Annotated, section 39-15-402(a)(3), and we remand for a new trial on that count. The Defendant's remaining convictions are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

ROBERT L. HOLLOWAY, JR., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Debra A. Wall (on appeal) and J. Runyon (at trial), Clarksville, Tennessee, for the appellant, Windie L. Perry.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; John W. Carney, District Attorney General; and Kimberly Lund and John Finklea, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case stems from the long-term abuse of two of the Defendant's adopted children, V.P. and G.P.[1]  On May 2, 2011, the Montgomery County Grand Jury issued a 47-count indictment against the Defendant, charging her with multiple counts of rape of a child, aggravated rape, especially aggravated kidnapping, and aggravated child abuse.[2]  Following a jury trial conducted January 17-27, 2012, the Defendant was found guilty of the following offenses:[3]

| Count | Offense | Victim | Classification |
|---|---|---|---|
| 1 | Facilitation of Rape of a Child | G.P. | Class B felony |
| 9 | False Imprisonment | G.P. | Class B misdemeanor |
| 13 | Especially Aggravated Kidnapping | G.P. | Class A felony |
| 15 | Especially Aggravated Kidnapping | V.P. | Class A felony |
| 17 | False Imprisonment | G.P. | Class B misdemeanor |
| 21 | Reckless Endangerment | G.P. | Class A misdemeanor |
| 22 | Aggravated Child Abuse | V.P. | Class B felony |
| 23 | Aggravated Child Abuse | G.P. | Class B felony |
| 27 | Reckless Endangerment | G.P. | Class A misdemeanor |
| 31 | Reckless Endangerment | V.P. | Class A misdemeanor |
| 36 | Aggravated Assault | G.P. | Class C felony |
| 37 | Reckless Endangerment | V.P. | Class A misdemeanor |
| 46 | Reckless Endangerment | V.P. | Class A misdemeanor |
| 47 | Reckless Endangerment | G.P. | Class A misdemeanor |

[1] It is the policy of this Court to identify minors by their initials only.

[2] The Defendant's oldest daughter, Elizabeth Perry, was charged as a co-defendant.  Because Elizabeth shares a common last name with the Defendant and the victims, we will refer to her by her first name in this opinion.  We intend no disrespect.

[3] After the Defendant's motion for judgment of acquittal, the trial court dismissed seven counts and the State entered a nolle prosequi on seven counts.  The jury acquitted the Defendant on 19 other counts.

The trial court sentenced the Defendant, as a Range I standard offender, to a total effective sentence of 20 years in the Department of Correction. Thereafter, the Defendant filed a motion for new trial, which the trial court denied. This timely appeal followed.

## I. Facts

***State's Case-in-Chief***

At trial, the Defendant's neighbor, Mary Taylor, testified that, in the early evening on March 18, 2008, she heard loud screaming outside her home. When Mrs. Taylor opened her front door, she saw two young girls. The older, taller girl was screaming and crying. She had on a boy's shirt, "some very shabby jeans," and no shoes. The younger girl was trying to drag the older girl away from Mrs. Taylor's house. The older girl appeared terrified and asked Mrs. Taylor to help her. When she got to Mrs. Taylor's front porch, the younger girl ran towards the Defendant's home.

Mrs. Taylor noticed that the older girl, whom Mrs. Taylor later identified as the Defendant's 13-year-old daughter, V.P., had a large knot on her head that was bleeding and a swollen, bloody lip. Mrs. Taylor asked her husband to hand her the phone, and she called 911 while standing outside on the porch with V.P.

Moments later, the Defendant and her husband, Mr. Perry, arrived at Mrs. Taylor's residence. V.P. begged Mrs. Taylor, "Don't make me go back there[.]" Unsure of the situation, Mrs. Taylor placed V.P. behind her back. Mr. Perry told V.P. to come with him, but the girl began whimpering and cowering behind Mrs. Taylor. When V.P. would not leave with him, Mr. Perry accused Mrs. Taylor of kidnapping the child and threatened to have her arrested. The Defendant screamed at Mrs. Taylor that she needed to give back her daughter. Mrs. Taylor, who was still on the phone with the 911 dispatcher, informed the Defendant that she had called the police and that, when officers arrived, they could sort out the situation. When the Defendant began pulling on V.P.'s arm, Mrs. Taylor noticed that V.P.'s hand appeared to be broken and that V.P. was trying to protect her hand. V.P. told Mrs. Taylor that she did not want to go home, so Mrs. Taylor "body blocked" the Defendant and Mr. Perry until police arrived.

Once officers arrived, V.P. went inside Mrs. Taylor's home. Mrs. Taylor recalled that V.P. was happy and relieved to be inside. She appeared to be very hungry and ate two bowls of chicken and dumplings and an entire bag of goldfish crackers. Mrs. Taylor offered V.P. a popsicle, but V.P. was unable to hold it because her hand was so malformed. Mrs. Taylor testified that her thumb "looked totally out of joint," and V.P. was unable to move it.

After eating, V.P. had to use the bathroom, but she could not get her pants off because they were tied with a cord that had been knotted tight. Eventually, an officer had to cut the cord so that V.P. could use the bathroom. Mrs. Taylor testified that V.P. was dirty, her hair was matted and unkempt, and she smelled very badly.

Officer Bruce Pettitt, with the Clarksville Police Department, testified that he responded to a disturbance call at Mrs. Taylor's home on March 18, 2008. When he arrived, Officer Pettitt saw Mrs. Taylor standing on the porch of her house with V.P. behind her. The Defendant was in the yard yelling at Mrs. Taylor and V.P. Mr. Perry and several other children were standing in the yard behind the Defendant. Officer Pettitt separated the parties and took Mrs. Taylor and V.P. into Mrs. Taylor's house. While talking to V.P., Officer Pettitt noticed that she had a small amount of blood on her mouth. She also had a laceration on her head, some puncture wounds on her hands, and "what looked like old wounds on her ankles that were consistent with . . . ligature marks." V.P. also appeared small for her age. She looked "dishevelled" and smelled badly.

After his initial interview with V.P., Officer Pettitt went outside to speak to the Defendant. When he asked the Defendant how V.P. received her injuries, the Defendant gave multiple stories. Initially, the Defendant said that V.P. got the cut on her head and blood on her mouth when she had fallen down while running away from the house. The Defendant then told Officer Pettitt that V.P. had inflicted the wounds on herself. The last story from the Defendant was that V.P. received the injuries while fighting with her 11-year-old sister.

At one point, Officer Pettitt accompanied the Defendant back to her house to look for some medication. Once inside the Defendant's residence, Officer Pettitt could smell "the very strong odor" of dog excrement and urine and noticed that clothes were piled everywhere. Officer Pettitt testified that the house was in such a state that he found it difficult to believe anyone actually lived there.

-4-

Officer Heather Hill of the Clarksville Police Department testified that she responded to Mrs. Taylor's residence to assist Officer Pettitt. Officer Hill sat with V.P. at Mrs. Taylor's kitchen table while V.P. ate goldfish crackers and drank a soft drink. V.P. was very timid and shy and did not want to make eye contact with Officer Hill. V.P. seemed to be very hungry and was focused on eating.

Officer Hill recalled that V.P. had on boy's jeans, which were tied with a string. She also wore a boy's short sleeve button down shirt and a red undershirt but no undergarments. V.P. had a bloody lip and blood on her shirt. Officer Hill noticed that V.P. had an open wound to the top of her head and marks on her arms. Officer Hill photographed scars and marks that she found on V.P.'s wrists, hands, back, legs, feet, and ankles. V.P. told Officer Hill that she had been abused by the Perrys and had been "previously made to sleep in dog kennels."

Officer Hill next spoke to V.P.'s 11-year-old sister, G.P., and noticed multiple injuries, which she photographed. Officer Hill noted that G.P. was unclean and, like V.P., was dressed differently from the rest of the Defendant's children. Officer Hill went to Gateway Medical Center ("Gateway Medical") with V.P. and G.P. At the hospital, both girls ate a lot of food, including several sandwiches, bags of chips, milk, and cookies. Officer Hill testified that she was in the emergency room with G.P. when G.P. told doctors that the marks on her body were from V.P. G.P. claimed that V.P. was "mentally retarded" and beat her up all of the time. When doctors asked G.P. how she got the ligature marks on her wrists and ankles, she claimed that she "tied herself up with a rope." G.P. also stated that V.P. ran away because V.P. wanted to be reunited with their older, biological sister who was not adopted by the Defendant.

Sergeant Donnie Robbins of the Clarksville Police Department testified that he also responded to the scene at Mrs. Taylor's residence on March 18, 2008. When he arrived, he saw the Defendant, Mr. Perry, and some children sitting inside a truck in front of Mrs. Taylor's home. Sergeant Robbins spoke with the Defendant and Mr. Perry briefly and then went inside Mrs. Taylor's residence. Sergeant Robbins saw V.P. sitting at a table. She was bleeding from the lip and had blood coming from the back of her head. Sergeant Robbins also noticed that V.P.'s left hand was severely deformed and she had ligature marks around her wrists and ankles. After speaking with V.P., Sergeant Robbins contacted a detective.

The Defendant and Mr. Perry gave Sergeant Robbins consent to search their home. Inside, the residence was in "total disarray, filthy, [and] smelled of urine and feces." Sergeant Robbins noticed a spatula, rolling pin, and white rope inside the residence, but another officer collected those items.

Susan Coghill, a paramedic with the Montgomery County Emergency Medical Services, testified that she treated V.P. after responding to Mrs. Taylor's residence. Ms. Coghill recalled that V.P. was very thin, wore dirty clothes, and had poor hygiene. V.P. complained of abdominal pain and head pain, and she said that her left hand was hurting. Ms. Coghill saw two burns on the back of V.P.'s head–one with the hair "sort of matted over it" and another with "white flesh showing and the hair missing." V.P. told Ms. Coghill that the Defendant had burned her head while fixing her hair. V.P. explained that she had been hit in the head on the same place as the burn earlier that day.

V.P. had a lot of bruising to the face, neck, knees and around both ankles and swelling to the tops of her feet. Ms. Coghill noted that the bruises appeared to be in various stages of healing. V.P. also had puncture marks between the webbing of her fingers on both hands. Additionally, V.P. had burns around her wrists, a burn to her left arm and left ear, and a swollen left hand. Regarding her hand, V.P. could only move two fingers and complained about "how bad it hurt."

Dr. Robert Paasche, an emergency room physician at Gateway Medical, testified that he treated V.P. and G.P. on March 18, 2008. After obtaining a medical history from both girls, Dr. Paasche examined them. Dr. Paasche observed multiple injuries to V.P. She had a linear burn through her hair on her scalp, which she stated was caused by a curling iron. V.P. had multiple contusions and abrasions on her face, some of which appeared to be several days old. Dr. Paasche noticed linear bruising up and down her neck and multiple bruises to her lower abdominal wall in various stages of healing.

V.P. told Dr. Paasche that she had been hit in the head and on her hand with a rolling pin, and she complained about having a lot of pain in her left thumb. Dr. Paasche noted that V.P.'s left hand had "quite a bit of deformity and swelling around the left thumb[.]" After x-rays were taken, Dr. Paasche discovered that the injury was a "very significant fracture" and dislocation of the thumb. Dr. Paasche did not believe that such an injury could be self-inflicted. V.P. also said that she had jumper cables applied to her hands, and Dr. Paasche

saw injuries to her hands that were consistent with V.P.'s explanation. She also had bruising all across her knuckles that appeared to be "recurrent, repeated injury . . . like somebody's been hitting her on the knuckles."

Dr. Paasche testified that V.P. had a large area of bruising on her knees and legs, which looked like she had been forced to kneel or thrown to her knees several times. V.P.'s bottom was "essentially . . . one big bruise across her entire buttocks." Dr. Paasche stated that it looked like multiple, recurrent injuries, which had caused soft tissue damage. V.P. indicated that she had been whipped and beaten with different objects, and Dr. Paasche testified that the injuries to her bottom could have been caused by a hand, belt, or some other object. V.P. also had linear abrasions and contusions around her ankles. Her feet were swollen and painful, and it appeared that circulation had been cut off to her feet. Dr. Paasche testified that these injuries were consistent with V.P.'s account of having been repeatedly tied down by the arms and ankles.

Dr. Paasche recalled that V.P. was calm as she described the abuse she had suffered. Based upon her demeanor, Dr. Paasche believed that V.P. had been experiencing a severe amount of pain for a long time and that she had become emotionally detached such that she was able to calmly discuss what had happened to her.

Dr. Paasche also treated G.P. During his examination, Dr. Paasche noted that the girl was malnourished and small for her age. G.P.'s lips were swollen, and she had multiple contusions and abrasions about her head and face in various stages of healing. When asked about a bruise to her forehead that appeared new, G.P. said that she had fallen earlier that day. Dr. Paasche testified that the marks on G.P.'s lips were consistent with having had jumper cables clamped onto her mouth.

Dr. Paasche recalled that G.P. had many areas of healing lacerations, abrasions, and bruising on her arms. She also had linear bruises around her wrists and arms that were consistent with something being tied very tightly around them. Additionally, Dr. Paasche noticed bruises along G.P.'s abdomen in various stages of healing and that she had a "large continuous area of bruising across her entire butt, which appeared to be related to repeated, recurrent trauma." Like her sister, G.P. had deep bruises on her knees and linear bruises around her ankles that were consistent with ligature marks. Dr. Paasche described pinpoint wounds on G.P.'s thighs, which he stated were consistent with having been caused by a

staple gun. G.P. also had damage to the inside of both cheeks. Dr. Paasche testified that these injuries were from something pushing the inside of her mouth against her teeth, such as being slapped in the face repeatedly. G.P. also had a completely severed frenulum[4] under her tongue, which Dr. Paasche described as a "hallmark sign of abuse." The injury to G.P.'s frenulum was consistent with having pliers pull at or yank on the tissue. These findings made Dr. Paasche concerned that G.P. had been suffering from severe abuse. He stated, "These are not normal childhood bumps and falls." Moreover, the injuries did not appear to be self-inflicted.

Dr. Laurie Harris-Ford, a pediatrician working at Gateway Medical, was called to the emergency room to see V.P. Dr. Harris-Ford conducted a physical exam, took a medical history, and wrote orders to admit V.P. to the hospital so that she could be observed overnight. Dr. Harris-Ford learned that V.P., who was 13 years old, was placed in the Defendant's home at age nine and began being abused by the Defendant around age 11. V.P. said that, earlier that day, the Defendant hit her on the head and on the left hand with a rolling pin. Dr. Harris-Ford noted that V.P. had a fractured and dislocated thumb and a contusion to the back of her skull. The girl also had multiple marks, bruises, and scars all over her body, including ligature marks around both ankles and wrists.

Dr. Harris-Ford testified that the injury to V.P.'s left thumb was consistent with someone bending back her thumb. The contusion to V.P.'s head was consistent with someone hitting her in the head with a rolling pin. Dr. Harris-Ford testified that bruises on V.P.'s fingertips were consistent with having jumper cables placed on them. Dr. Harris-Ford diagnosed V.P. as suffering from "acute abuse," a contusion to the head, and a dislocated thumb. The doctor saw no signs that V.P. was mentally retarded.

Seventeen-year-old V.P. testified that, in March 2008, she lived with her adoptive parents–the Defendant and Mr. Perry–and her siblings.[5] V.P. recalled that she went to public school before she was adopted by the Defendant. After her adoption, the Defendant home-schooled V.P. and her siblings. V.P. explained, however, that she and G.P. were often singled out and treated differently from the rest of the Defendant's children. Many times, the

---

[4] Dr. Paasche explained that the frenulum is the tissue which connects the bottom of tongue to bottom of mouth.

[5] V.P. testified that her oldest sister, Elizabeth, was an adult in March 2008.

Defendant made V.P. and G.P. clean the house instead of teaching them, and on one occasion, V.P. told the Defendant that the only reason she adopted them was so that they could be her "Merry Maids."

According to V.P., the Defendant was the "boss" in their house, but both the Defendant and Elizabeth would punish V.P. and G.P. V.P. explained that she was usually punished for not cleaning fast enough and for wetting the bed. As punishment for these offenses, the Defendant and Elizabeth would beat her with various items, including a red rubber hose, a baseball bat, metal poles from a closet organizer, and spatulas. The Defendant and Elizabeth also hit V.P.'s fingers, toes, knees, and elbows with a hammer if she did not clean quickly enough. V.P. explained that she would get blood clots under her fingernails from being hit with the hammer. On other occasions, the Defendant and Elizabeth used jumper cables on V.P. as punishment. V.P. testified that they would put jumper cables on her fingers, toes, lips, and breasts. The jumper cables created blisters, and they hurt a lot. When V.P. would cry, the Defendant would put the jumper cables on her lips to stop her from crying.

V.P. recalled that, one day, when she was working in the yard, the Defendant accused her of trying to tear up the Defendant's plants. The Defendant told V.P. that, since V.P. did not want to work, she would put clothes pins on V.P. The Defendant then applied clothes pins to V.P.'s lips, eye lids, ears, fingers, toes, legs, breasts, and vagina. The Defendant made V.P. leave the clothes pins in place until the rest of the family had finished the yard work. V.P. recalled that the clothes pins hurt and made bruises all over her body.

On another occasion, the Defendant and Elizabeth bent back V.P.'s fingers as punishment for not cleaning properly. When they pulled back on her thumb, her thumb broke. V.P. testified that it "hurt really, really bad" and she could not use her hand afterwards.

While living with the Defendant, V.P. and G.P. were locked in dog kennels by the Defendant and Elizabeth for long periods of time. V.P. explained that she would be "bunched up" in the kennel with her knees to her chest and she had to sleep inside the kennel in that position. Additionally, because there was a lock on the kennel and she could not get out, V.P. would often use the bathroom on herself. One time, in order to clean out the kennel, the Defendant put it into a bathtub full of hot water while V.P. was still inside the

kennel. V.P. testified that she held onto the top of the metal cage, trying to lift herself out of the hot water. The Defendant then poured boiling water from a tea pot onto V.P.'s hands. This caused V.P. to let go of the kennel and fall into the scalding water. Afterwards, the Defendant and Elizabeth put Aloe Vera and Vaseline on her bottom. V.P. testified that her injuries "hurt really bad" for a period of time. The skin on her bottom was red and peeled off, leaving a scar.

The Defendant and Elizabeth also restrained V.P. and G.P. by tying them to cots for long periods of time. V.P. recalled that the first time she was tied to a cot occurred prior to her thirteenth birthday. V.P. explained that sometimes they were made to lay on their backs, and sometimes they were placed on their stomachs. The Defendant placed handcuffs or rope around her hands and feet and used ropes and chains around the rest of her body. The ropes left ligature marks around V.P.'s wrists and ankles. The Defendant bound V.P. and G.P. together, connecting their ankles with handcuffs. After the ropes and handcuffs were on, the Defendant and Elizabeth would wrap a chain around V.P. and G.P. and put a lock on it. V.P. testified that she did not want to be tied down to the cot and she only got onto the cot so that she would not get into trouble. When she was tied to the cot, V.P. could not get up or move.

V.P. testified that the Defendant often withheld food from her and G.P. She estimated that the longest she and G.P. went without food was "three to five days." During that time, the Defendant would give them "a big cup of water and a piece of bread or a big cup of water and a vitamin." After not eating, V.P. felt weak and "very hungry." She did not feel healthy, and the lack of food made it hard for her to clean.

V.P. explained that she witnessed many of G.P.'s punishments. She recalled that the Defendant and Elizabeth would tie up G.P. and beat her. During one beating, the Defendant duct taped G.P.'s feet together and her hands behind her back. She then put duct tape around G.P.'s face to stop her from screaming. As the Defendant and Elizabeth beat G.P. with a red rubber hose and a bat, G.P. stopped moving and breathing. The Defendant cut off the duct tape with a pair of scissors and told V.P. and Elizabeth to throw cold water on G.P.'s face. When they did, G.P. woke up and began breathing. The Defendant then instructed V.P. and Elizabeth to take G.P. upstairs and put her into a cold bath. The Defendant poured cold water on G.P.'s face and asked her if she was okay.

V.P. described another punishment G.P. suffered after G.P. urinated on herself while tied to a cot. The Defendant made V.P. hold down G.P.'s arms and legs. The Defendant then stuck a broomstick into G.P.'s vagina.

V.P. recalled that the only time she left the Defendant's home was to go to church and to clean the yard. When she went to church, she would wear turtlenecks and long sleeves to cover up scars on her body. V.P. testified that she never told anyone at church about the abuse because "they were [the Defendant's] friends and I never think nobody [sic] would believe me." V.P. denied ever taking swimming lessons or going to the YMCA after her adoption. Between the time of her adoption and the day she ran away, V.P. was never taken to see a doctor for her injuries.

V.P. testified that she decided to run away on March 18, 2008, because she thought that she and G.P. were going to die. On that day, V.P. was helping the Defendant in the kitchen when the Defendant said that V.P. was not doing something properly. The Defendant then hit her in the mouth with a spatula and in the head with a rolling pin. The rolling pin opened up a sore on the top of V.P.'s head, which had been caused days before by the Defendant's applying a flat iron to V.P.'s scalp. When the Defendant put V.P. out on the porch, V.P. told G.P. that she was going to run away. V.P. ran to the end of the street, yelling for help, and Mrs. Taylor came out on her front porch. V.P. testified that she got behind Mrs. Taylor on the porch when the Defendant, Mr. Perry, and the other children pulled up in a truck. When the police arrived at Mrs. Taylor's, V.P. told them about the Defendant's abuse.

G.P., who was 15 years old at the time of trial, testified that she was adopted by the Defendant and Mr. Perry in July 2004 when she was nine years old. G.P. described the first few years with the Defendant as "good" and "normal." She went shopping, out to eat, and to church with the family.

In the two years leading up to March 18, 2008, however, things became "rough" for G.P. in the Defendant's home. G.P. explained that the Defendant and Elizabeth began hitting her with various implements. As punishment for not cleaning fast enough, the Defendant and Elizabeth would hit G.P. with belts, ropes, bats, hammers, a metal pole, chains, and a red rubber hose. Sometimes the beatings would leave marks.

G.P. recalled a specific time when the Defendant hit her with a bat. G.P. had been in the living room folding clothes when Elizabeth said that she was not folding a shirt correctly. The Defendant came into the room with a bat and hit G.P. in the head with it. Another time, the Defendant hit G.P. with an ax, causing her arm to bleed. The Defendant would also purposely burned G.P.'s scalp with a flat iron while fixing her hair. G.P. explained that the Defendant would leave the flat iron on her head "until she felt like taking it off." On another occasion, the Defendant was angry that G.P. was crying too loudly. She took a pair of pliers and put them under G.P.'s tongue, cutting the piece of skin there.

When shown police photographs of her back and neck, G.P. identified injuries that resulted from being hit with the red hose and a belt. G.P. identified a photograph of her legs and ankles and explained that the marks on her legs were from belts, the red hose, and extension cords. The bruises on her knees were caused by the Defendant's hitting her knees with a hammer. G.P. also identified bruises on her legs that were caused by a staple gun. She explained that the Defendant would put staples into her legs and then force her to pull them back out.

G.P. explained that she was not given a lot to eat while living with the Defendant and that sometimes the rest of the family would eat while she was locked downstairs in a dog kennel. G.P. specifically recalled that, on Thanksgiving Day one year, she was tied to a cot along with V.P. and they did not get to eat with the rest of the family. G.P. stated that the longest she went without food was five days. When she would tell the Defendant that she was hungry, the Defendant would not give her anything to eat. She felt weak when the Defendant withheld food.

G.P. testified that many nights she was made to sleep in a black metal dog kennel or a blue plastic kennel with V.P. When the Defendant and Elizabeth would lock the girls into the kennels, sometimes G.P. had on clothes and sometimes she was naked. She had to sit with her knees against the metal and legs bent into her chest. G.P. explained that she and V.P. could not get out of the dog kennels and often had to use the bathroom on themselves. G.P. testified that she and V.P. never put each other in the kennels "for fun." Many times when the rest of the family went to church, they were locked in a kennel in the basement, and they were sometimes left in a kennel for days.

At other times, the Defendant and Elizabeth tied G.P. to a cot by placing metal handcuffs on her wrists and ankles and wrapping a chain around her body. G.P. testified that she would get onto the cot to be tied down because she was afraid of the Defendant and Elizabeth. On many of these occasions, G.P. urinated and defecated on herself because she could not get up to go to the bathroom. G.P. recalled a specific instance when the Defendant stated that she was "tired of [G.P.] peeing on [herself]." After this pronouncement, the Defendant took off all of G.P.'s clothing and instructed Elizabeth and V.P. to hold down G.P.'s arms and legs. The Defendant then stuck a metal broomstick inside G.P.'s vagina. G.P. testified that it felt "[h]orrible" and that she bled from her vagina afterwards. Because she was bleeding, the Defendant instructed her to sit on an orange mop bucket.

G.P. described a second incident in which the Defendant punished her for urinating on herself. G.P. explained that she was again held down by Elizabeth and V.P. and the Defendant put the broomstick in her vagina. She did not bleed after this second incident. G.P. testified that the third time the Defendant used the broomstick on her occurred in the upstairs hallway. Elizabeth and V.P. held G.P. down, and the Defendant inserted the broomstick into her vagina. The Defendant instructed Elizabeth and V.P. to turn G.P. over onto her stomach, and the broomstick was inserted into G.P.'s bottom. G.P. testified that it felt "awful." She screamed and tried to get away during these events.

G.P. recalled the Defendant and Elizabeth also tied her and V.P. to chairs that were placed back to back. Because she was tied to the chair with ropes, chains, and handcuffs, G.P. was unable to get up to use the bathroom and had to use the bathroom on herself. G.P. identified a key found inside the Defendant's home as being a key to the handcuffs that had been used on her. The Defendant and Elizabeth also forced G.P. and V.P. into a hall closet one day. They stacked baskets of clothes in front of the closet door so that the girls could not get out.

The Defendant and Elizabeth also used duct tape to restrain G.P. G.P. recalled one time when the Defendant and Elizabeth placed duct tape on her face "all the way around [her] mouth and nose, [her] eyes, [her] ears." The Defendant then beat G.P. with a bat all over her body because G.P. had not been working fast enough. G.P. testified that the beating hurt and she passed out at one point. She woke up in the bathtub upstairs. Someone had removed the duct tape from her face, and the Defendant apologized and asked if she was okay.

On the day that V.P. ran away, the Defendant hit G.P. and V.P. with a bat. The Defendant also placed jumper cables on G.P.'s lips and feet because she was crying. G.P. identified photographs of herself taken that day and explained that her lips were swollen from the jumper cables. G.P. acknowledged that she first told police that V.P. was mentally retarded and that V.P. would beat her up. She also told Officer Hill that the ligature marks on her wrists and ankles were from tying herself up. G.P. explained that she did not ask for help that night because she was afraid that she would have to go back to the Defendant's house. G.P. agreed that some of the marks on her body occurred from playing outside, but she denied that V.P. ever hit her. G.P. also denied that she had ever accused anyone else of abusing her.

G.P. testified that the Defendant had allowed her to play outside when she was first adopted. In the last two years that she lived with the Defendant, however, G.P. had not been allowed to play outside. G.P. only went to church with the family two or three times a month. She explained that she never reported the Defendant's abuse because the Defendant was always around. G.P. recalled one day when V.P. told the Defendant that the only reason the Defendant adopted them was so that she could have "Merry Maids." The Defendant laughed and replied, "[N]o, y'all are worse than that, y'all are my slaves."

Seventeen-year-old T.P. testified that he was adopted by the Defendant and Mr. Perry when he was a baby. Prior to the events of March 18, 2008, T.P. lived in the Defendant's home with the Defendant, Mr. Perry, and his six siblings. T.P. testified that the Defendant was the "boss" in the house, and she decided if someone was to be punished. Mr. Perry was not at the residence most of the time because the Defendant would kick him out. The Defendant had a "really close" relationship with Elizabeth.

T.P. testified that, the last two years V.P. and G.P. were in the Defendant's home, the home was not a loving environment. The Defendant and Elizabeth often punished V.P. and G.P. by spanking them with belts. The Defendant punished the girls out of anger, and most of the time, V.P. and G.P. had done nothing to deserve punishment. T.P. saw the Defendant and Elizabeth punish V.P. and G.P. by putting jumper cables on their fingers. Occasionally, V.P. and G.P. were made to sleep in dog kennels in the basement or on the basement floor without blankets. Several times, the Defendant told T.P. to do things to hurt V.P. and G.P. or to "hold them down." T.P. testified that V.P. and G.P. had bruises and injuries "[a]ll over," which they did not have when they came to live with the Defendant but he never saw

-14-

V.P. and G.P. hurt one another. T.P. recalled that V.P. and G.P. did not always go to church with the rest of the family. To explain their absences, the Defendant would tell church members that V.P. and G.P. were in Chattanooga or out of town.

On the day that V.P. ran away, the Defendant sat inside a truck outside Mrs. Taylor's residence with T.P. and his siblings. The Defendant told the children to tell police "everything was okay." The Defendant told them that "whenever all this was over . . . she would keep [G.P.] and that she didn't like [V.P.] . . . ."

T.P. testified that he was interviewed by a detective on April 7, 2008. At that time, T.P. denied seeing any abuse occur to V.P. and G.P. and claimed that he had seen the girls hit each other. T.P. also told the detective that he saw V.P. trip and fall three or four times on the day she ran away. T.P. testified that he did not tell the truth about the things going on inside the Defendant's home because he was scared. Even after he was removed from the Defendant's home, T.P. continued to see the Defendant during supervised visitations. During her visits, the Defendant instructed T.P. to tell authorities that the house "was nice and everything." The Defendant also told T.P. to tell police that the girls hit each other. T.P. explained that it took him a year before he told the police the truth.

S.P., who was 17 years old at trial, testified that he was also adopted by the Defendant and Mr. Perry as a baby. In March 2008, he lived in the Defendant's home, along with V.P. and G.P. He recalled that V.P. and G.P. were treated "[v]ery badly" by the Defendant and Elizabeth. Unlike the rest of the Perry children, V.P. and G.P. did not go places outside the home. The girls did not go to church or Sunday school. Instead, V.P. and G.P. spent a lot of time in the basement duct taped to the bed. S.P. explained that the Defendant duct taped V.P.'s and G.P.'s arms and legs and placed tape over their eyes and mouths so that the girls could not move and the girls would be tied up or locked in a kennel when the rest of the family left the house. Additionally, when the family would sit down at the table to eat, V.P. and G.P. did not join them. They were usually locked up during meals.

S.P. recalled that the Defendant and Elizabeth would also hit V.P. and G.P., using belts, baseball bats, switches, and extension cords. He also witnessed the incident in which the Defendant burned V.P. and G.P. with hot water in the bathtub. He explained that the Defendant took boiling water from the stove and poured it on G.P. while G.P. sat in the bathtub screaming. The Defendant burned V.P. in the same manner, and V.P. screamed and

"hollered" when the Defendant burned her. S.P. remembered seeing marks on the girls' arms, legs, necks, and "basically almost everywhere on their bod[ies]," but he never saw V.P. and G.P. hit one another or hurt themselves. S.P. testified that he was at Mrs. Taylor's house after V.P. ran away and the Defendant told him and the other children "not to tell anybody anything of what happened" in their house.

Ten-year-old M.P. testified that, prior to March 18, 2008, she lived in the Defendant's home with her adoptive sisters, V.P. and G.P. M.P. explained that the Defendant put V.P. and G.P. in dog kennels located inside the basement of the house. Many times, the girls did not have clothes on while in the kennels. M.P. also saw the Defendant tie V.P. and G.P. to chairs, using handcuffs and rope. The Defendant would hit V.P. and G.P. on their bottoms with a red "rubber thing." One time, M.P. saw the Defendant hit V.P.'s thumb with a hammer.

Jaha Martin testified that, in April 2008, she worked as a social worker at Our Kids, a clinic for children who are alleged to have been sexually abused. At that time, Ms. Martin spoke to V.P. and G.P. in order to gather information for the clinic's nurse practitioner. During their conversation, V.P. told Ms. Martin that she often had headaches, bad dreams, and difficulty sleeping. V.P. disclosed that she had been locked in a dog kennel and in a closet while in the Defendant's house. She also described being tied to a cot at times. She disclosed further physical abuse that included being hit with baseball bats and poles. V.P. described other occasions when she had hot water from the stove thrown on her, jumper cables placed on her lips and thumbs, and was beaten with a rubber hose. V.P. said that the Defendant and Elizabeth were her primary abusers.

Ms. Martin also obtained a medical history from G.P. G.P. related to Ms. Martin that she had been restrained multiple times by being tied to a cot and locked in a dog kennel. She recalled that, one time, duct tape had been applied to her mouth and she had difficulty breathing. G.P. disclosed that she had been struck with a bat, cut on the arm with an ax, and had jumper cables placed on her lips. G.P. also told Ms. Martin that a broomstick had been put in her vagina and her anus. She said that it hurt and she bled the entire day. G.P. indicated that the Defendant and Elizabeth had committed the abuse against her.

Beverly Cotton, a pediatric nurse practitioner, testified that she worked as a sexual assault nurse examiner with Our Kids in April 2008. Ms. Cotton conducted both a physical

and genital exam of V.P. and G.P. During G.P.'s genital examination, Ms. Cotton noticed that G.P. had a complete absence of hymen tissue at about the four o'clock position, which was consistent with G.P.'s history of an object being inserted into her vagina. G.P.'s anal exam was normal.

Detective Larry Boren of the Clarksville Police Department testified that, on the night of March 18, 2008, he requested the police department's crime scene unit to respond to the Defendant's residence after Mr. Perry consented to a search of the home. Detective Boren explained that the Defendant's residence was filthy inside and had a strong odor. The search took hours because the home was in such disarray.

Several weeks later, Detective Boren interviewed the Defendant, Mr. Perry, and Elizabeth. Mr. Perry told the detective that he never saw the girls' injuries and he had no explanation for them. Elizabeth also claimed to have never seen the injuries to V.P. and G.P. During his interview with the Defendant, Detective Boren showed the Defendant photographs of the girls' injuries. The Defendant told Detective Boren that one of the girls put rubber bands around her wrists. The Defendant also said that V.P. had burned herself with a curling iron. She did not know how V.P. broke her thumb and claimed that V.P. had had no problems using her hand. The Defendant denied putting the V.P. and G.P. in dog kennels and sexually assaulting them.

Detective Boren also spoke to S.P. and T.P. They claimed that V.P. and G.P. were "emo"[6] and that they hurt themselves. S.P. and T.P. denied that the Defendant had abused any of the children. S.P. related to the detective that V.P. and G.P. often fell out of trees and that was how they received some of their injuries.

Officer Brad Crowe of the Clarksville Police Department testified that, as part of the investigation into the abuse against V.P. and G.P., he searched the Defendant's home, which was a one story house with a basement. Inside the home, Officer Crowe located a set of jumper cables on top of the washer and dryer. He also found a rolling pin and two spatulas in the kitchen. In the basement bedroom, Officer Crowe located white nylon rope or twine near a cot, as well as a link chain that was attached to a floor joist. There was also an

---

[6] S.P. explained to Detective Boren that being "emo" meant that the girls pulled out their own hair, hit themselves, and cut on themselves.

extendable shower curtain rod and a piece of aluminum pipe in the basement bedroom. Officer Crowe recalled that there were two dog kennels in the home–a plastic one and a larger, wire kennel. Investigators did not find any handcuffs in the residence.

Special Agent Charles Hardy with the Tennessee Bureau of Investigation (TBI) testified that he worked in the Serology and DNA Unit of the TBI crime lab. Agent Hardy tested several items of evidence in connection with the Defendant's case for the presence of blood and DNA. Agent Hardy testified that his examination of some white nylon rope yielded no blood and, while there was DNA present, it was too degraded to be conclusively tested. Agent Hardy also tested a set of jumper cables, and he explained that, while the testing of the jumper cables failed to indicate the presence of blood, he found a mixture of DNA belonging to V.P. and G.P. Agent Hardy testified that when he examined the rolling pin from the Defendant's residence, he found DNA that matched V.P.'s profile but he found no blood staining on the item. Finally, Agent Hardy tested two spatulas from the Defendant's home, but the DNA found on the items was insufficient or too degraded to be matched to any known profile.

Dr. Jeffry Watson, an orthopedic surgeon at Vanderbilt University, testified that in March 2008, he treated V.P. for an injury to her left thumb. V.P. reported that her left thumb hurt and did not move well. Dr. Watson found that V.P. had limited motion in the thumb and that the thumb was ineffective for grasping and holding objects. Upon further examination, Dr. Watson noted that V.P.'s thumb had been fractured and the fracture was not healing normally. He estimated that the fracture had occurred more than a month prior to V.P.'s visit and had yet not healed, which indicated to Dr. Watson that the thumb had been subject to a lot of motion. According to Dr. Watson, the fracture was consistent with V.P.'s thumb being pulled backwards by a significant amount of force. It was also consistent with being hit with a hammer. Dr. Watson performed two surgeries on V.P. in order to promote proper healing and to release some of the tightness in the muscle, skin, and ligament around the area. Dr. Watson testified that, despite two surgeries, V.P. still does not have normal use of her thumb.

Dr. Wesley Thayler, a plastic surgeon with Vanderbilt University, testified that he treated V.P. and G.P. for scarring. He reviewed the girls' medical history and learned that they had disclosed repeated trauma to and binding of their arms and legs. Upon his examination, Dr. Thayler found that V.P. and G.P. had multiple, significant scars on their arms and legs, which caused the girls "significant emotional distress." Dr. Thayler operated

on V.P.'s right arm and right leg to make her scars less noticeable. He was not able to operate on all of V.P.'s scars because some were located too close to bones or joints. Dr. Thayler also operated on G.P.'s arms. While he was able to make the scars less noticeable on both girls, Dr. Thayler opined that the scars would last forever.

***Defendant's Proof***

Neda Johnson, a case manager with the Department of Children Services (DCS), testified that, in November 2002, she was the case manager for V.P., G.P., and their two biological sisters. Ms. Johnson recalled that V.P. and G.P. were originally placed in a foster home in Chattanooga but were removed after the foster parent notified DCS that she was not going to adopt the girls. Ms. Johnson reviewed a presentation summary from DCS dated December 3, 2003, which indicated that V.P. had been diagnosed with major depression disorder, recurrence, severe with psychotic features, anxiety disorder, impulse control disorder, and possibly post-traumatic stress disorder. She explained that V.P. and G.P. went to live with the Defendant in December 2003.

Gina Jirkovsky testified that, on December 26, 2003, the Defendant brought V.P. to see a doctor at Centennial Pediatrics, with the complaint that V.P. had sores around the genital area. Ms. Jirkovsky, who was a medical assistant, assessed V.P.'s medical history and checked her vital signs. At that time, V.P. did not have marks, bruises, and scars all over her body.

Kevin Finch testified that he had lived next door to the Defendant for the two years leading up to March 18, 2008. During that time, Mr. Finch sometimes saw V.P. and G.P. outside in the yard. Occasionally, they were playing or riding bikes, but most of the time, Mr. Finch saw them doing yard work. Mr. Finch testified that the Defendant and her family went to church often and he saw V.P. and G.P. go to church with the rest of the family. Mr. Finch had been inside the Defendant's kitchen one time for a party, and he did not see anything that made him think that V.P. and G.P. were being abused.

Fred Tedescucci testified that he was a foster parent for all of the minor Perry children in March 2008, after the children were removed from the Defendant's home. Mr. Tedescucci described the children as "very well-behaved," with the exception of V.P. and G.P. While in his home, V.P. and G.P. were rowdy, argumentative, and always fighting with each other.

-19-

During one argument, G.P. grabbed V.P.'s shirt and ripped it off of V.P. Mr. Tedescucci testified that he also caught V.P. and G.P. lying several times.

Christina Hite testified that she had also been a foster parent for V.P. and G.P. after they were removed from the Defendant's home. Initially, Ms. Hite took the girls into her home with the intention of adopting them, and she believed the girls' claims of abuse. Ms. Hite stated, however, that she eventually came to believe that V.P. and G.P. were not telling the truth about the abuse. She recalled that, in July 2009, while trying to punish G.P. by sending G.P. to her room, G.P. stated, "I am tired of you abusing me[.]" This statement concerned Ms. Hite, and she reported it to G.P.'s caseworker, Amanda McClain. On another occasion, G.P. told Ms. Hite that their biological sister, who had not been adopted by the Defendant, used to cut G.P. and V.P. with a knife. When G.P. made this comment, V.P. said, "Shhh." Ms. Hite recalled that V.P. later told her that the Defendant came to V.P. in a dream and said, "[T]ell the truth, just tell the truth."

In the year that V.P. and G.P. were in her home, Ms. Hite had to call the police two times. The first time, V.P. had been expelled from school for bullying another child. When Ms. Hite confronted V.P. about her behavior, V.P. started screaming at Ms. Hite and went outside. Ms. Hite called the police a second time after V.P. tore up a room and left the house. Ms. Hite explained that V.P. would get angry and say things like, "I'm going to cut your head off or I am going to cut your arms off and stick it in a blender . . . ."

Ms. Hite also recalled that G.P. would kiss V.P. all over her body with an open mouth. One day, Ms. Hite saw G.P. in bed with V.P., and G.P.'s pants were off. V.P. angrily demanded that Ms. Hite get out of her room.

On cross-examination, Ms. Hite acknowledged that V.P. told her she ran away from the Defendant's house because the Defendant hit her with a spatula. Moreover, V.P. and G.P. expressed fear of the Defendant and Elizabeth. Both girls had recurring nightmares about the things that happened in the Defendant's home, and Ms. Hite agreed that the girls seemed visibly shaken after the nightmares. They also continued to wet their beds in Ms. Hite's home.

Amanda McClain testified that she worked for Omni Vision, an agency that provides therapeutic foster care for children with behavioral issues, educational and medical needs,

and alcohol or drug dependence. Ms. McClain recalled that she received a phone call from Ms. Hite on May 19, 2009, over an incident with V.P. Ms. McClain went to Ms. Hite's residence and found V.P. outside, refusing to come back inside the home. V.P. was verbally aggressive and hostile. She did not want to obey Ms. Hite's rules and said that she "would rather go to jail than to stay [with Ms. Hite]."

Ms. McClain testified that she had documented a later conversation with Ms. Hite, in which Ms. Hite said that she believed both V.P. and G.P. were lying about the abuse they had suffered. Ms. Hite reported that the girls "tormented each other" and that she believed the Defendant was innocent. Ms. McClain recalled that Ms. Hite had wanted to adopt G.P. and she was upset after G.P. was removed from her home.

Ms. McClain testified that, in her time with the girls, she had seen V.P. get angry and hit or pinch G.P. However, Ms. McClain believed that V.P.'s and G.P.'s behavioral issues were similar to other abused and neglected children. Ms. McClain stated that she had seen a lot of children in foster care but she had never seen children with injuries like V.P. and G.P.

Erin Fowler, a clinical psychologist, testified that she saw V.P. and G.P. in April 2008. At that time, V.P. told Ms. Fowler that the Defendant's abuse began when she was six or seven years old and that she was hit with a hammer, bats, and chairs. Ms. Fowler acknowledged that a child's ability to conceptualize time was different from that of an adult and that if a child lacks environmental cues for dates and times, they can lose track of time.

Angela Groppel, the Defendant's long-time friend, testified that she attended church with the Defendant at First Assembly of God. On Sunday nights, Ms. Groppel ran a Junior Bible Quiz program at the church. She recalled that, in the 2006-2007 school year, V.P. and G.P. were registered to participate in the program. G.P. went to two Junior Bible Quiz competitions in November 2006, but after the first two classes, V.P. stopped attending the program. The Defendant told Ms. Groppel that V.P. had no desire to participate. Ms. Groppel testified that she still saw V.P. at church on Sunday mornings. She recalled that V.P. and G.P. were always nicely dressed at church. Ms. Groppel also saw V.P. and G.P. at home school co-op classes on Friday mornings in the 2007-2008 school year. Ms. Groppel stated that the Defendant appeared to be a loving mother and to take care of her children. Ms. Groppel saw no indications that V.P. and G.P. were being abused.

Keith Cherry testified that he had known the Defendant for about 16 years. He met the Defendant and Mr. Perry through the foster care program. Mr. Cherry and his family often spent holidays and birthdays with the Defendant's family. He testified that he had been to the Defendant's home many times and had never seen it in disarray. Mr. Cherry recalled that, in the months leading up to March 18, 2008, he had seen V.P. and G.P. while out to eat or out shopping. He also saw the girls on Thanksgiving and Christmas in 2007. Mr. Cherry did not believe the girls were being abused.

Mr. Cherry's wife, Ramona, testified that she had known the Defendant for about 15 years. She met the Defendant through DCS foster care program meetings. Mrs. Cherry recalled that, before the Defendant finalized the adoption of V.P. and G.P., she brought them to Mrs. Cherry's home. Mrs. Cherry's first impression of the girls was that they were "not happy children." The Defendant tried to make them a part of the family, but it seemed that, the more the Defendant tried, the more V.P. and G.P. refused to be part of the family. Mrs. Cherry recalled that she was at the Defendant's home on Thanksgiving Day in 2007 and saw V.P. and G.P. in the kitchen eating that day.

Mrs. Cherry testified that, on one occasion, she noticed markings on the girls' arms and legs. They had rubber bands around their arms and legs, and Mrs. Cherry told the Defendant that the rubber bands could cut off their circulation. According to Mrs. Cherry, when she told V.P. and G.P. that they should take off the rubber bands, they said "that's in or something like that."

Mildred Ramsey testified that she met the Defendant through church in 1984. Ms. Ramsey stated that she would trust the Defendant with her grandchildren and great grandchildren. She did not believe the allegations against the Defendant. She testified that in the weeks prior to March 18, 2008, she had seen V.P. and G.P. at church and they were clean, well-dressed, and happy.

Michelle Fraley testified that, in 2002 or 2003, she met the Defendant and the Defendant's family through a home school co-op. Ms. Fraley recalled that, in the months leading up to March 18, 2008, she saw V.P. and G.P. at the co-op classes. The girls were dressed normally and seemed eager to meet their parents between classes. Ms. Fraley saw no indication that V.P. and G.P. were being abused.

Pearl Lucas testified that she attended church with the Perry family and had known the Defendant for about 15 years. Mrs. Lucas stated that the Defendant's family was a happy, loving family. She recalled that, in the months leading up to March 18, 2008, all of the children attended church regularly. Mrs. Lucas' husband, Leo, also testified that, in the period of time leading up to March 18, 2008, he saw the Perry family every Sunday and Wednesday at church.

Margarita Jacobs testified that she had attended church with the Defendant for eight years and, during that time, she worked with V.P. and G.P. in the children's choir. Ms. Jacobs testified that she was shocked by the allegations of abuse, as the girls had appeared normal.

Nece Rye testified that she knew the Perry family from church and that V.P. and G.P. had attended the Wednesday night girls' ministry there. Mrs. Rye recalled that, in the weeks and months prior to the charges, the Defendant's family seemed to be happy and the whole family attended church together. Mrs. Rye saw no indications that V.P. and G.P. were being abused.

Larry Rye, the youth pastor at the Defendant's church, testified that he had seen the Defendant and her family in church in the months prior to V.P. making the allegations of against the Defendant. However, he never saw anything to lead him to believe that V.P. and G.P. were being abused.

### State's Rebuttal Proof

Dr. Janie Berryman, a licensed clinical psychologist, testified that a child's ability to conceptualize time is the last thing to develop cognitively. Dr. Berryman added that, when a child experiences trauma, this can add to the confusion surrounding the timing of events, especially if there are prolonged or multiple episodes of trauma. According to Dr. Berryman, children of abuse often have trust issues and difficulty managing their anger. She explained that children often do not tell about abuse because they fear that nobody will believe them.

Dr. Berryman treated V.P. and G.P. and recalled that both girls had trouble trusting others. V.P. had particular trouble adjusting and was sometimes aggressive. Dr. Berryman opined that V.P.'s aggressive behavior was typical under the circumstances.

## II. Analysis

On appeal, the Defendant challenges the sufficiency of the evidence as it relates to her convictions for especially aggravated kidnapping (Counts 13 and 15), aggravated child abuse (Counts 22 and 23), facilitation of rape of a child (Count 1), and aggravated assault (Count 36).

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In order to sustain a conviction of a lesser-included offense, "the proof must be sufficient to support each and every element of the conviction offense." State v. Parker, 350 S.W.3d 883, 909 (2011). A reviewing court must examine each element of the offense of which the defendant stands convicted and determine if each element is supported by sufficient evidence. Id. "If the proof does not adequately support each and every element, the defendant is entitled to a reversal of the conviction." Id. This is true even if the evidence is sufficient to support a conviction for the greater offense. Id.

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, because they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This Court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

Especially Aggravated Kidnapping

The indictment in this case provided that, between July 2, 2006 and March 18, 2008, the Defendant unlawfully and intentionally or knowingly confined G.P. (Count 13) and V.P. (Count 15) "by force, threat or fraud" so as to substantially interfere with their liberty by tying the victims down to a cot with ropes, handcuffs and chains, at a time when each of the victims was under the age of thirteen.

The Defendant argues that the evidence is insufficient because it does not support a finding that the Defendant used force, threat, or fraud to confine the victims to the cots.[7] The Defendant asserts the only testimony that the victims were tied to cots with rope, chains, and handcuffs came from the victims themselves and that neither victim specifically testified that the offenses were accomplished by force or threat. The State responds that ample evidence was presented at trial to support the Defendant's convictions on these charges. We agree with the State.

As relevant here, especially aggravated kidnapping is defined as false imprisonment when "the victim was under the age of thirteen (13) at the time of the removal or confinement." Tenn. Code Ann. § 39-13-305(a)(2). False imprisonment, in turn, occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). "Unlawful" is defined by statute, as follows:

"Unlawful" means, with respect to removal or confinement, one that is accomplished by force, threat or fraud, or, in the case of a person who is under

_____

[7] In her brief, the Defendant acknowledges that the especially aggravated kidnapping counts of her indictment were not subject to dismissal on the basis that she was the parent of the victims because the indictment alleged that the victims were removed or confined by "force, threat, or fraud." See State v. Goodman, 90 S.W.3d 557, 565 (Tenn. 2002) (concluding that "as the minor child's father, the defendant is not subject to prosecution for especially aggravated kidnapping under Tennessee Code Annotated section 39-13-305(a)(2) in the absence of an allegation that the minor child was removed or confined by force, threat, or fraud."); see also Robert L. Mitchell v. State, No. M2008-02121-CCA-R3-PC, 2009 WL 3103772, at *18 (Tenn. Crim. App. Sept. 29, 2009), perm. app. denied, (Tenn. Mar. 15, 2010) (finding that the petitioner's status as the stepfather of the minor child was not a basis for trial counsel to seek dismissal of the superseding indictment charging the petitioner with especially aggravated kidnapping where the indictment alleged the use of force, threat, or fraud).

the age of thirteen (13) or incompetent, accomplished without the consent of a parent, guardian or other person responsible for the general supervision of the minor's or incompetent's welfare.

Tenn. Code Ann. § 39-13-301(15).

Kidnapping is a continuous offense. See State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999). An act of confinement does not end merely upon the initial restraint; rather, a defendant continues to commit the crime at every moment the victim's liberty is taken. Id.

When viewed in the light most favorable to the State, the evidence is sufficient to support the Defendant's convictions. V.P. testified that the Defendant often tied her and G.P. to cots for long periods of time. The Defendant used handcuffs or ropes around V.P.'s hands and feet, and she wrapped a chain around the rest of V.P.'s body and put a lock on it. V.P. testified that the first time the Defendant tied her to a cot occurred prior to her thirteenth birthday. When she was tied to the cot, V.P. could not get up or move.

G.P. testified that, between July 2, 2006 and March 18, 2008, the Defendant tied her to a cot by placing metal handcuffs on her wrists and ankles and wrapping a chain around her body. G.P. could not get up to go to the bathroom, and as a result, she urinated and defecated on herself while tied to the cot. When officers searched the Defendant's residence, they found many of the items described by the victims, including white nylon rope, cots, a chain, and a handcuff key.

Contrary to the Defendant's position, the evidence supports a finding that the Defendant used threats and force to confine the victims. V.P. testified that she did not want to be tied down to the cot and she only got onto the cot because of her fear of additional punishment from the Defendant. G.P. explained that she would get onto the cot to be tied down because she was afraid of the Defendant and Elizabeth. Moreover, the State presented evidence regarding the amount force used by the Defendant in keeping the victims tied to the cots. Multiple witnesses testified that they observed ligature marks on the victims' wrists and ankles. Dr. Paasche testified that V.P. had linear abrasions and contusions around her ankles and her feet were swollen and painful, as if the circulation to her feet had been cut off. Dr. Paasche opined that these injuries were the result of V.P. having been repeatedly tied down by the arms and ankles. Likewise, Dr. Paasche found that G.P. had deep linear bruising

around her wrists, arms, and ankles that were consistent with something being tied very tightly around them. Dr. Thayler testified that the repeated trauma and binding of the victims' wrists and ankles left scarring so severe that the victims needed plastic surgery to make their scars less noticeable.

Under these circumstances, we find that the evidence is sufficient to support the Defendant's convictions for especially aggravated kidnapping in Count 13 and 15.

### Aggravated Child Abuse

The Defendant also challenges the sufficiency of the evidence as it relates to her convictions for aggravated child abuse in Counts 22 and 23. Count 22 of the indictment alleged that the Defendant

> unlawfully and intentionally or knowingly, other than by accidental means, did treat V.P., a child under 18 years of age, in such a manner as to inflict bodily injury and a deadly weapon or dangerous instrumentality, to wit: beating with poles and/or a belt, was used to accomplish the act . . . .

In closing argument, the State elected that the Defendant had hit V.P. with a pole and that the pole caused injury in the form of marks on her back and disfigurement. On appeal, the Defendant asserts that the evidence is insufficient to support her conviction on this count because there was no evidence presented as to what material the pole was made out of and no evidence of any injury being produced by the pole.[8]

As to Count 23, the indictment alleged that the Defendant

> unlawfully and intentionally or knowingly, other than by accidental means, did treat G.P., a child under 18 years of age, in such a manner as to inflict bodily injury by repeatedly striking the victim with a red rubber hose, thereby causing serious bodily injury, to wit: protracted disfigurement . . . .

---

[8] The Defendant also contends that a belt is not a deadly weapon or dangerous instrumentality based upon what she sees as a lack of evidence regarding the amount of force used and any injury caused by a belt. However, based upon the State's reliance at trial on the pole as the deadly weapon or dangerous instrumentality for Count 22, the Defendant's use of a belt is not at issue.

The Defendant contends that the evidence presented at trial is insufficient as to this count because there was no indication as to how hard G.P. was struck with the hose and there was no evidence tying the marks on G.P.'s body to the hose. The State responds that sufficient evidence was presented to support the Defendant's convictions for both offenses. We agree with the State.

The statute in effect at the time of the offenses provided:

(a) A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment, who commits the offense of child abuse, as defined in § 39-15-401(a), or who commits the offense of child neglect or endangerment, as defined in § 39-15-401(b), and:

(1) The act of abuse or neglect results in serious bodily injury to the child;

(2) The act of neglect or endangerment results in serious bodily injury to the child;

(3) A deadly weapon, dangerous instrumentality or controlled substance is used to accomplish the act of abuse, neglect or endangerment; or

(4) The act of abuse, neglect or endangerment was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim.

Tenn. Code Ann. § 39-15-402(a)(3) (2008). A person commits child abuse who knowingly, other than by accidental means, treats a child under 18 years of age in such a manner as to inflict injury. Tenn. Code Ann. § 39-15-401(a) (2008).

"Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2008). "Serious bodily injury" means injury that involves: a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Tenn. Code Ann. § 39-11-103(a)(34) (2008). "Deadly weapon" is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5) (2008).

In this case, V.P. testified that, during the last two years she lived with the Defendant, the Defendant often beat her for not cleaning fast enough and for wetting the bed. According to V.P., the Defendant would hit her with various implements, including metal poles from a closet organizer. Multiple witnesses testified that, on the day V.P. ran away, she had multiple scars, marks, and bruises all over her body, and the State introduced photographs of the victim's injuries. V.P. later disclosed to Ms. Martin that the Defendant's physical abuse included hitting her with a pole, and Officer Crowe testified that he found an extendable shower curtain rod and a piece of aluminum pipe in the basement bedroom during his search of the Defendant's house.

Additionally, Dr. Paasche, who treated V.P. at the hospital, testified about the nature and possible causes of V.P.'s injuries. Dr. Paasche testified that V.P. had linear bruising up and down her neck and multiple bruises to her lower abdominal wall in various stages of healing. She also had bruising all across her knuckles that appeared to be "recurrent, repeated injury . . . like somebody's been hitting her on the knuckles." Dr. Paasche described the injuries to V.P.'s bottom as multiple, recurrent injuries, which had caused soft tissue damage. Dr. Paasche opined that V.P.'s injuries were consistent with having been whipped and beaten by an object. Under these circumstances, it is our view that the evidence was sufficient to establish that the Defendant used the metal pole as a deadly weapon or dangerous instrumentality to commit aggravated child abuse against V.P., as alleged in Count 22.

Regarding Count 23, the evidence shows that, when G.P. did not clean fast enough, the Defendant hit her with a red rubber hose, which left marks on G.P.'s body. The victim's younger sister, M.P., observed the Defendant beating G.P. with the red "rubber thing." When shown photographs of her back and neck at trial, G.P. specifically identified injuries that were from being hit with the red hose. She also identified a photograph of her legs and ankles and explained that the marks were from being hit with the red hose, along with belts and extension cords. Dr. Paasche testified about G.P.'s multiple injuries and opined that she was suffering from "severe abuse" and her injuries were not self-inflicted. The State also offered testimony from Dr. Thayler, who explained that the Defendant's abuse left multiple, significant scars on G.P.'s arms and legs. Although Dr. Thayler was able to perform plastic surgery on some of the scars to reduce their appearance, Dr. Thayler testified that many of the scars would last forever. Under these facts, we find that the evidence was sufficient to support the Defendant's conviction for aggravated child abuse of G.P. based upon serious bodily injury to the child. The Defendant is not entitled to relief.

Facilitation of Rape of a Child

Both the Defendant and her oldest daughter, Elizabeth, were charged with rape of a child in Counts 1-4 of the indictment. The jury convicted the Defendant and Elizabeth of the lesser-included offense of facilitation of rape of a child in Count 1 and acquitted them on Counts 2-4. However, the Defendant argues on appeal that the evidence does not support her conviction for facilitation of rape of a child because there was no proof that she provided substantial assistance to another committing a felony.

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant ... if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2008). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (2008).

A person is "criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2008). The Sentencing Commission Comments which follow this section state:

> A defendant charged as a party may be found guilty of facilitation as a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party. The lesser punishment is appropriate because the offender, though facilitating the offense, lacked the intent to promote, assist or benefit from the offense.

Id.

Count 1 alleged that, between July 2, 2006 and March 18, 2008, the Defendant and Elizabeth

> unlawfully and intentionally, knowingly or recklessly did sexually penetrate G.P., who was more than 3 years of age and less than 13 years of age, by causing an object to be inserted into her vagina . . . .

During closing argument, the State argued that the Defendant and Elizabeth acted in concert to commit this offense, asserting that "you can't talk about the rape of a child count without talking about Elizabeth Perry" and that, because the victim kicked, screamed, and fought throughout the offense, the rape could not have happened without both defendants' participation.

We conclude that the evidence presented at trial is sufficient to support the Defendant's conviction for facilitation of rape of a child. In the light most favorable to the State, the evidence reflects that, working together, the Defendant and Elizabeth removed G.P.'s clothing, held G.P. down, and inserted a metal broomstick into G.P.'s vagina. G.P. testified that this was a form of punishment for her having urinated on herself while tied to a cot and that both the Defendant and Elizabeth doled out punishment in their house. G.P. further testified that it felt horrible and that she fought and tried to get away. G.P. recalled that she bled afterwards and the Defendant told her to sit on a mop bucket. The victim later disclosed to the social worker at Our Kids that a broomstick had been inserted into her vagina, and the sexual assault nurse examiner testified that G.P. had a complete absence of hymen tissue at about the four o'clock position, which was consistent with an object being inserted into her vagina.

The Defendant contends that there was no evidence that she gave substantial assistance to a perpetrator of the felony of rape of a child. In support of her argument, the Defendant cites to State v. Jackie Caldwell, No. E2008-00307-CCA-R3-CD, 2009 WL 3191706, at *10-15 (Tenn. Crim. App. Oct. 6, 2009), app. dismissed, (Tenn. Mar. 18, 2010), in which this Court reversed the defendant's conviction for criminal responsibility for facilitation of rape of a child. However, that case is inapposite because it focuses on whether the defendant was criminally responsible for offenses under Tennessee Code Annotated section 39-11-402(3) based upon the theory that the defendant had a "duty imposed by law" to prevent the commission of the offenses. Jackie Caldwell, 2009 WL 3191706, at *15. In this case, the Defendant was not charged with an offense based upon her duty to protect the victim.

Moreover, the jury in this case could reasonably infer from the proof that the Defendant and Elizabeth worked together to accomplish the offense. By working in concert, the Defendant and Elizabeth provided substantial assistance to each other to accomplish the act. Thus, under the facts of this case, we conclude that the evidence is sufficient to support the Defendant's conviction for facilitation of rape of a child and the Defendant is not entitled to relief.

<u>Aggravated Assault</u>

The Defendant contends that the evidence is insufficient to support her conviction for aggravated assault, as a lesser-included offense of aggravated child abuse in Count 36. She asserts that she was convicted of *intentional* aggravated assault and, because intentional aggravated assault is not a lesser-included offense of aggravated child abuse, her conviction cannot stand. The State responds that, in finding the Defendant guilty of aggravated assault as a lesser-included offense of aggravated child abuse, the jury specifically determined that the Defendant had acted "knowingly" and the Tennessee Supreme Court has held that *knowing* aggravated assault is a lesser-included offense of aggravated child abuse. The State further contends that the evidence is sufficient to support the Defendant's conviction for aggravated assault.

Tennessee Code Annotated section 40-18-110(f) provides that an offense is a lesser-included offense if:

  (1) All of its statutory elements are included within the statutory elements of the offense charged;

  (2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);

  (3) The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or

  (4) The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

Tenn. Code Ann. § 40-18-110(f) (2012).[9]

---

[9] We note that subsection (f) of Tennessee Code Annotated section 40-18-110 was added by the Tennessee General Assembly in 2009, after the Defendant is alleged to have committed the instant offense. At least one panel of this Court has previously concluded that the law to be applied in determining lesser-included offenses is the law as it existed at the time the charged offense was committed rather than at the time of trial. <u>See</u> State v. David Lynn Harrison, No. E2008-01082-CCA-R3-CD, 2010 WL 3238309, at *10 (Tenn. Crim. App. Aug. 17, 2010), <u>no appeal filed</u>. However, in <u>William Glenn Wiley v. State</u>, 183 S.W.3d 317, 328 (Tenn. 2006) our supreme court indicated that the issue of lesser-included offenses is controlled by the prevailing law at the time of trial, not the law at the time of commission of the offense. <u>See also</u>

Both parties cite to State v. Honeycutt, 54 S.W.3d 762 (Tenn. 2001) in support of their respective positions. In Honeycutt, our supreme court reversed the defendant's conviction for aggravated child abuse after finding that the defendant's counsel had been ineffective at trial. Honeycutt, 54 S.W.3d at 769. In order to provide guidance to the trial court on remand, the court went on to address additional claims raised by the defendant, including the issue of whether aggravated assault was a lesser-included offense of aggravated child abuse. Id. at 770-72.

At the time of the offense in Honeycutt, aggravated child abuse consisted of the following elements:

(1) Knowingly, other by accidental means;

(2) Abusing a child under 18 years of age; and

(3) Either:

    (a) a deadly weapon is used; or

    (b) the abuse causes serious bodily injury.

Id. (citing Tenn. Code Ann. § 39-15-402 (1999)). In comparison, the pertinent elements of aggravated assault were:

(1) Intentionally, knowingly, or recklessly

(2) Committing an assault; and

(3) Either:

    (a) a deadly weapon is used; or

    (b) the assault causes serious bodily injury.

---

Chivous Robinson v. State, No. E2005-01036-CCA-R3-PC, 2006 WL 1381511, at *5 (Tenn. Crim. App. May 19, 2006), perm. app. denied, (Tenn. Oct. 2, 2006). Accordingly, we have applied the law on determining lesser-included offenses as it existed at the time of the Defendant's trial.

Id. (citing Tenn. Code Ann. § 39-13-102 (1999)). By comparing the relevant statutory elements, the court determined that knowing or reckless aggravated assault was a lesser-included offense of aggravated child abuse because all of the statutory elements of aggravated assault were included within the charged offense of aggravated child abuse.[10] Id.

However, unlike the defendant in Honeycutt, the Defendant in this case was charged with aggravated child abuse based upon an act of abuse that was "especially heinous, atrocious or cruel, or involved the infliction of torture to the victim."[11] Specifically, Count 36 of the indictment alleged that, between July 2, 2006, and March 18, 2008, the Defendant:

> unlawfully and intentionally or knowingly, other than by accidental means, did treat G.P., a child under 18 years of age, in such a manner as to inflict bodily injury by covering her entire face with duct tape and striking her with a bat and said acts of abuse, neglect or endangerment were especially heinous, atrocious or cruel and involved the infliction of torture to the victim[.]

Thus, the charged offense of aggravated child abuse consists of the following elements:[12]

(1) Knowingly, other by accidental means;

(2) Abusing a child under 18 years of age; and

(3) The act of abuse was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim.

Tenn. Code Ann. § 39-15-402(a)(4) (2008).

In comparison, aggravated assault consists, in relevant part, of the following statutory elements:

---

[10] The court in Honeycutt analyzed the issue under State v. Burns, 6 S.W.3d 453, 466-67 (Tenn.1999) and found that knowing or reckless aggravated assault was a lesser-included offense of aggravated child abuse under Burns part (a). Honeycutt, 54 S.W.3d at 771.

[11] The aggravated child abuse statute was expanded in 2005 to cover an act of abuse that was "especially heinous, atrocious or cruel, or involved the infliction of torture to the victim." See 2005 Tenn. Pub. Acts 487, § 2; Tenn. Code Ann. §§ 39-15-402(a)(4) (2005).

[12] For the purposes of clarity and comparison, the elements of the relevant offenses set forth below have been paraphrased.

-34-

(1) Intentionally, knowingly, or recklessly

(2) Committing an assault; and

(3) Either:

      (a) a deadly weapon is used; or

      (b) the assault causes serious bodily injury.

Tenn. Code Ann. § 39-13-102(a)(1), (2) (2012).

Neither serious bodily injury nor the use of a deadly weapon is included within the statutory elements of the offense of aggravated child abuse as it is charged in the Defendant's indictment. Accordingly, we find that knowing aggravated assault is not a lesser-included offense of aggravated child abuse in this case and should not have been submitted to the jury. See Tenn. Code Ann. § 40-18-110(a). We, therefore, reverse the Defendant's conviction for aggravated assault in Count 36 and remand for a new trial on any other lesser-included offense that has not already been rejected by the jury. See State v. Cross, 362 S.W.3d 512, 523 (Tenn. 2012) (citing State v. Rush, 50 S.W.3d 424, 432 (Tenn. 2001)).

### III.  Conclusion

For the foregoing reasons, the Defendant's conviction for aggravated assault in Count 36 is reversed and the count is remanded for a new trial on any offenses which qualify as lesser-included offenses of aggravated child abuse that were not originally charged or were charged but which are lesser offenses than aggravated assault. All other judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE